Good morning, Your Honors. May it please the Court. This case turns on a basic structural error. Berkeley pled specific implementations of method claims by Grainger and DHL, but those defendants were severed from the case on the premise that Teradata could stand in their shoes. Yet, the Court later… Do you read the action on the motion to sever and stay as barring discovery against the customer defendants? I do, Your Honor. I do, Your Honor, and let me tell you why. So in the decision on the motion to sever and stay, the Court says that the District Court envisions that even if TVA infringed, the sole issue left would be damages, and that is at appendix page 9. And the Court relied on the customer suit exception, which has a couple of purposes. One is to streamline litigation in different districts, which this case doesn't have, but another one is to remove the customers from the suit entirely when there's no difference between the product asserted of infringement by the manufacturer and the product asserted of infringement by the customers. Here, there was no product. Why did it take you so long to make these arguments before the Court? That's the problem here, isn't it? I understand, Your Honor, and Berkeley was… And while we're at it, are we looking at an abuse of discretion standard? Yes, Your Honor. For the customer suit exception, we're looking at an abuse of discretion standard. I would… I want to focus on infringement too, so I want to make sure I get to that. But specifically, Your Honor, for the customer suit exception, this case doesn't really deal with the discovery issues. During the case, of course, Berkeley was trying to comply with the judge's severance order and Berkeley was working with Teradata to get the information it needed. But the issue here on the customer suit exception is not the discovery or the later ask for discovery. The issue is instead that the customer defendants shouldn't have been severed and stayed to begin with because Berkeley pled in the complaint and in its motion in opposition to Teradata's motion that those defendants specifically implemented the method that Teradata sold. So Teradata sold a method, but they did it their own way. So it was improper to remove them to begin with. I'm a little confused here because we're talking about two different possible effects of the order severance. One is to bar discovery with respect to the customer suits and certainly the order did that. But there's also the question of whether it barred discovery against the customers in connection with the suit against Teradata. And that, it seems to me, is less clear. Could you help me? Because the original motion wanted to sever and stay the accounts against the customers. It didn't say anything specific about staying discovery against the customers in connection with the suit against Teradata, right? Your Honor, I think that was the intent of the motion was to remove the customers so the case could proceed against Teradata. Yes, Your Honor. And Your Honor, in addition to the section of the decision that I quoted, there's a later decision where the court is denying Berkeley's request for discovery and the court says that it recognized that the stay structure foreclosed discovery. And that's at Appendix 6460. So I think that that also shows that had Berkeley come earlier, it would have been futile. But again, for the customer suit, the issue is not what happened later. The issue is that Berkeley specifically pled these implementations that were different from the method claim that Teradata made to the method that the customer defendants performed. And the district court recognized this. This goes to the abuse of discretion standard, Your Honor. The district court recognized Berkeley's arguments that the customers had quote, substantial knowledge and expertise in the use and implementation of the patented method. That's at 92 to 93. It also recognized that the customer's methods were custom built and designed for specific customer databases at 93 and 94. And finally, that Granger uses the services of the patented level object level accounting and not Teradata. And that's at note 2 at 89. The problem is, and the abuse of discretion is, after the court recognized those specific features that only the customer defendants could supply, it found the customers to be peripheral and stayed them. And that is where our error lies, Your Honor. In addition, one more point, Teradata So all these arguments you're making deal with the customization issue. Yes, Your Honor, they do. And that argument is the one that you make, it took a long time to come up with it. Why is it, if it's so central to your case here today and on the field, why did it take you four years from the time that fact discovery was initiated for you to come up with this theory? Two points, Your Honor. First of all, it didn't. That theory was raised at the beginning in the complaint. In the second amended complaint, for example, at 373 to 374 and 375 to 383, Berkeley pled that Granger used Teradata's pricing engine to blend information and to write their own code. So we're pleading this specific implementation. Granger expanded the Teradata rules from 280 to over 500. So again, these rules that are claimed are changing in the Granger device. The same goes for DHL, and those are at 374 to 375 and 383 to 390. So we did plead them. The court recognized them at the pleading stage, but still disregarded them. How long to move to vacate the Sutter and Stay order? I'm not understanding it. I mean, we're talking about over a year, well, 20 months after the fact discovery deadline ended, you moved to stay and Sutter. Why did it take so long? So, Your Honor, Berkeley was trying very hard to comply with the order, and it's not appealable. So Berkeley had to work within the constraints of the order, and it was trying to work with Teradata had said it could stand in the shoes of the customer defender. And you're saying that this was so important that you decided that you would wait so long to raise it? I'm not sure I understand. Your Honor, I disagree that we waited so long. Berkeley, throughout the case, was trying to work with Teradata to resolve these issues. You did not move to vacate the Sutter and Stay order until February of 2023. Is that accurate? I believe that's accurate, Your Honor. So I want to say one more thing about the customer stay, and that is that Teradata has admitted that these implementations are important. And that confirms the original error that occurred in implementation of the severance. Teradata now says that it's highly customizable depending on the customer's desires, needs, and preferences. And, Your Honor, to your point of why it took so long, Teradata was saying the opposite in the beginning. In addition, Teradata now says, and it says this in defense of the customer suit, it says that it accepts, indeed, in defense of the customer suit, Teradata accepts the very premise that Berkeley advanced at the pleadings. But at this point, you had already gone through the fact discovery period. Because we thought we were going to get what we needed from Teradata because they said they could provide it. Your Honor, the error did not occur in the discovery. The error occurred in the abuse of discretion at the customer suit level, and we were not allowed to appeal it. Well, you can appeal it now. And here we are. Your Honors, I'd like to turn to infringement for a minute. Infringement, the court made two errors on direct infringement. First, it entered judgment on the 316 patent without analyzing the 316 patent because it incorrectly assumed that the 521 patent was representative. The motion for summary judgment included the 316, right? It did not. It did not mention the 316. Well, but it said all the asserted points, right? It did, but it did not make any assertions with regard to the 316. It focused on limited limitations in the 521 patent. And second, which I will address, the 521 issue on 1E. But your opposition didn't say anything about the 316, right? No, Your Honor, but it's not our job to identify Teradata's failures. They had the duty to raise the issues, and they didn't raise a single limitation that was missing from the 316. And, Your Honors, the 316 doesn't have limitation 1E in the 521 patent. But it has 1D, and they argued 1D, right? They argued 1D with respect to the 521, and the court found that there was a genuine issue of material fact with respect to the 521 and 1D. They did not argue the 316 at all, and there is no 1E. So the one issue that the court found lacked a genuine issue is not present in that patent. And for that reason, the 316 decision should be reversed. Second, on the 521 patent, Teradata presented limitation 1E through Statement of Fact 67. And Berkeley objected to that Statement of Fact specifically. You can see that at 8684, starts at the bottom, goes to 8685. Indeed, Berkeley denied that Statement of Fact reflected Ms. Maracle's opinion, but Berkeley also said that that Statement of Fact was not an accurate representation of the claim language. And it said it was accounting, it was talking about general accounting principles. So it definitely, excuse me, Your Honors, so it did rebut that. And it directed, in 67, to the Maracle Report, which contains five to six pages of specific analysis on 1E. There was factual dispute. The court did not address it. And for this reason, infringement on 521E should be reversed as well. On inducement... Can you move to the 101 issue and explain how those claims contain an inventive concept of parallel processing? That would be the cross-appeal, right? Yeah. So she should do that. Okay. The cross-appeal. Thank you, Your Honor. Only real quickly on inducement. Again, Berkeley presented genuine issues of material fact with respect to inducement. Those things are normally inferred. And Teradata had a license for a field of use, so it could be inferred that it knew when it wasn't operating in that license. And Berkeley introduced evidence of Teradata's assistance in the customer implementations. You can see that at 529 through 533, where Berkeley walks through, specifically, things that look like the claimed process. Thank you. I'll reserve the rest of my time. Mr. Shaw. Good morning, Your Honor. May it please this honorable court, my name is Cal Shaw, and I have the pleasure today of representing the good people at Teradata, Granger, and the DHL entities. With me this morning is Ms. Jessica Roberts of Teradata, as well as one of my colleagues, Louie Constantino. Your Honors, I'd like to cover several issues this morning, but let me start with this issue raised by opposing counsel on the structural error. We vehemently disagree that there's any structural error. Okay, but can we be clear here as to what the order on the motion to sever and stay did? As I understand it, it barred discovery against the customers, both with respect to the customer accounts and also with respect to the accounts against Teradata, correct? Your Honor, I would say correct in part. So I do not, I cannot concede that it expressly precluded discovery against the customer. Well, it was interpreted that way by the district court. It may have been interpreted that way, Your Honor, but that does not create a. . . and also with respect to the suit against Teradata. Why can't they now appeal from that? I mean, it surely is too late for them to complain about the denial of the motion to reopen discovery. That seems to be correct. But why can't they appeal the original order foreclosing discovery against the customers? Your Honor, a couple of reasons. I would say at least two. First, it wasn't done at the time. But second, and perhaps more. . . What wasn't done at the time? Well, there was no request or reconsideration motion or appeal. . . Well, what's the case to say you don't have to request reconsideration to raise an issue complaining about an award? Fair enough, which is why the second issue is probably maybe perhaps more important, which is they, Berkeley in this case, certainly wasn't shy in bringing motions. And as the district court noted, and this is at appendix. . . I believe it was at appendix page 16. And this is a quote. The step that Berkeley did not take back in July of 2022 was it seems to be one. One taken literally at the 11th hour of the final line of fact discovery could be reopened under local rule patent 1.3. This is after a claim construction, Judge. And even before that. . . So what? They're complaining about the original order. Why can't they complain about the original order barring them from taking discovery? Well, they should have, Your Honor. And they should have done it. . . They are complaining about that here. Correct, Your Honor. But they're doing it too late, and they're doing it. . . Why is it too late? Because. . . They couldn't have done it earlier. They had no right to appeal the order severing and staying until they came up with a final judgment. Absolutely, Judge. This is because there was no preclusion per se. And so, for example, if we go back to what the district court judge said on May of 2021. . . And this is at Appendix 3539. The court said, once these. . . There's certain other issues that were pending. And the court said, third, once the designation of documents issues is resolved, there may or may not be some valid reason for reopening of discovery in this 4-year-old case for limited purposes. But plaintiff did not do that. As Judge Bassoon, I hope I'm saying it right, had noticed, they did not do that until February of 2023. They certainly could have come into court. To the extent that they're complaining about the action on that motion to reopen, you're absolutely right. It was too late. But they're also complaining about the original order. And I'm not understanding why it's too late to complain about the original order. Because they took no action when they had the time to do it. The only time they took action was in February of 2023 to reopen fact discovery when it was too late. And quite frankly, Your Honor, I believe that's part of a pivot. Because quite candidly, they did not get the evidence they needed from TVA. We stand by the position that while we don't infringe the discovery that they needed against these other defendants, they could have gotten from us. We produced 40,000 pages of documents, statements of work with respect to Granger contracts. And until February of 2023, they didn't say anything about this. In fact, we were before the court in March of 2021, and the judge said, you've asked for 30 days extension. I'll give you 60. And the plaintiff didn't say, Your Honor, we're having trouble with the sever and stay issue. We're having trouble with the customer defendants. Remember, they asserted induced infringement, which requires direct infringement. And we went all the way through to February 2023, and they hadn't raised it. Even at summary judgment, Your Honor, they did not say, well, we're going to do a Rule 56D as to Granger because Granger is one of these third-party defendants or customer defendants. They said in their summary judgment brief, and I can pull this slide up if you'd like, we can prove infringement against Granger despite this document issue. So it's only now after they've lost and they took that several attempts post-discovery, when they should have brought it before, having at all times known since the amended complaint that direct infringement was an issue, that they try to say, well, this sever and stay issue was an abuse of discretion. And it was not. It was under the spread spectrum case, the judge properly said, this may reduce major issues. And at no time during the discovery phase, the fact discovery phase, did the plaintiff suggest to the court, this is a problem, can we get this discovery? And as Judge Cole noted in that quotation I read you, the real issue here is they just waited too long. Maybe you should turn to the 101 issue. Yes. I appreciate that, Your Honor. So on 101, because I think in many ways that may resolve these other issues, as this court is very familiar, it's a two-part Alice test. And that two-part test focuses on the scope of the claims. And we've agreed for purposes of this case that the claim one of the 521 patent is representative. If you look at that claim, there are only really two components. The first three elements of that claim relate to an RDBMS. You said claim one is representative. Of all three patents, yes. Sorry, Judge. If you look at that first claim, claim one, it has essentially what we've broken down through elements A through F. The first three of those elements relate to something called a relational database. Now, the specification is clear that there's nothing special happening, no new use of this relational database. In fact, if you look at, and this is columns 3, lines 65 to 66, it says you use standard accounting practices and standard language SQL for purposes of the RDBMS. At column 11, the specification further specifies that you use standard protocol based on RDBMS textbooks. So nothing special about that. The next three components of the patent claim relate to calculating profit. In fact, the plaintiff itself characterizes the patent as one of calculating profit at object level. And so all we're doing is taking revenue, subtracting costs, we get profit. Age-old mathematical construct. Did you win or lose the summary judgment on 11? Well, I would say it's a split decision in that we got Alice step one but not step two. You can't appeal if you won at summary judgment. Correct. So, Your Honor, on step one, Alice step one, the court found that the claims did cover just an abstract idea. On step two, we lost on summary judgment. Because of parallel processing. Because of parallel processing, which, Your Honor, is not part of the claims. And as this court's precedent in the SAP case states, you cannot use, and in fact, that case, and I'll get you the site in a moment, Your Honor, but in that particular case, which we've cited in our brief, SAP, the same argument was made by the patentee, which is these are data processing claims relating to a database, but there's certain parallel processing they've done. That's unique. And the court found, well, that's not part of the claims. In contrast to, like, ENFISH, where in ENFISH, they did say, well, we're going to, the claims teach a new way, the self-referential table, a new way of performing and using this particular computer. Here, the specification is very clear. You use the RDBMS in the way that it's meant to be used, according to the textbooks in column 11, and all you do is you calculate profit. And so for that reason, Your Honor, we do believe that the district court erred in denying a summary judgment, because the district court focused on a narrow embodiment covered, which could have parallel processing, but was very clear that parallel processing is not required as part of the claims, and that's inconsistent with this court's jurisprudence under ALICE. And am I understanding correctly that if we find that the district court erred at the second stage of ALICE and, therefore, find that this is unpatenable under 101, that the whole issue with the severance pay order falls by the wayside? Would that be your position? Yes, Your Honor. And just for the record, the case I was referenced to is SAP-898F3-1161. Any further questions on the 101 issues, Your Honor? I'm happy to address them. But I do think that if you look at this court's jurisprudence, particularly in SAP and BSG, this patent fits squarely within that construct. All it does is says we're calculating profit, and we're doing so using an RDBMS. If there are no questions on 101, briefly, with the remaining time, I would like to turn to the issue of infringement. In particular here, I believe the district court's determinations on infringement are threefold. It should be affirmed. Let me start with each defendant separately. As to TARA data, there are... In your summary judgment motion, there's no reference to the 316 patent other than a generic statement that you're moving on all the asserted claims, right? That's correct, Judge. And there's no discussion of the 316 patent in the motion? Well, other than we say all asserted claims and all the claims do teach the same function, I believe for the first time on appeal, we're hearing that somehow the 316 is distinct. But quite frankly, Judge, I was looking at that over the weekend. I think the claim is probably indefinite if we get to that level because it's missing an entire limitation, meaning if you look at it, the plaintiff suggests, I believe, that element 1E is missing. If you remember, because I was telling you that this is on the 101 side, there are only three mathematical components to the claim. One is you calculate profit. The next is you calculate cost. And the last element, F, is you subtract one from the other to get your object level profitability. Somehow in claim 316, they don't have this, or at least they claim they don't have this component of calculating the cost. And if you don't have that, you can't get the profit because you're now missing this element. And, in fact, if you read element 1F of the 316 patent, it says combined, but it doesn't say what to combine with. Now, we never got the opportunity to raise that argument beneath because for the first time on appeal, as Your Honor noted, the plaintiff suggests, or I guess appellant now, suggests that there was not this, we were not asserting the infringement against or non-infringement against all claims, and that's just not true. As Your Honor pointed out over and over again in our brief, we said as to all claims, these elements 1D and 1E are missing. So that relates to 1D and 1E, and that would apply, Your Honor, both to Teradata because it is directly related to the claim. It also applies to Grainger because Grainger was expressly sought in the summary judgment. This goes back to the initial issue of plaintiff had the opportunity to say, I'm going to abstain from Grainger, but affirmatively said in the summary judgment briefing, we have the evidence and we're proceeding on Grainger. And then to close out, because I would like to save my remaining time, Your Honor, as to the DHL defendants, Your Honor, the court granted our motion to dismiss under the 271G, and that should stand as well because here we're just talking about profit. That is data and the RDBMS, and so we would ask that all three of those decisions be affirmed. Thank you, Your Honor. Your Honors, on 101, I note counsel spent a long time arguing the facts, but then he simplified the invention, but I think it's more important to look at what the judge did. The judge didn't just rely on the parallel processing, which is an advantage that results from the invention, but the judge also said that the claims recite a novel and unconventional software architecture where the individual profitability calculations are performed within the RDBMS. And the judge relied on... You agree that as to parallel processing, it's not a claim requirement? It's not a claim requirement. It's an advantage that results from the use of the... So you can't rely on that at step two? I don't think you can't rely on it, but it's an advantage. I don't need to rely on it. Let's leave it at that. It's an advantage that results from the claims. However... How is your case distinguishable from SAP? Your Honor, in SAP, SAP dealt with financial analysis claims in the abstract, but here this court found a specific implementation of the unconventional architecture, and that unconventional combination is where the RDBMS performs profitability using established rules. Those are claimed, and those rules are applied to selected and prepared information. The district court said that Teradata cited no evidence showing that this combination was conventional. And remember, on summary judgment, we're on invalidity, and so they had to provide clear and convincing evidence, which they did not do. On the flip side, Berkeley provided the testimony of its expert, Scarborough. So, importantly, Teradata does not dispute the underlying technological facts on appeal. It just argues that they don't qualify. Turning quickly to my counsel said that to get discovery, we asked for 30 to 60 days towards the end of discovery. What language in the district court opinion are you relying on as suggesting that there's an alternative plan that's just step two, other than parallel processing? Yes, Your Honor, several statements. First of all, at Appendix 52... Sixty-two? I think it's 52, Your Honor. Fifty-two. That's where I read that quote that the claims recite a novel and unconventional software architecture. And then at Appendix 49... Wait a second. Excuse me? I'm trying to find the part you're referring to. And you're suggesting that that's separate and apart from the parallel and simultaneous processing? Yes, Your Honor, because the claims do more than just permit parallel and simultaneous processing. And it's the combination of these changes in architecture that make the claims inventive concept. You can't just extract one out of the other. What more do they do? Your Honor, the claims... The specification... The undisputed record shows that the architecture in which the... I'm asking you what more do they do. I'm not asking you to cite to the record. What more do they do? Your Honor, because they take the profitability calculations inside, they are able to provide a more correct analysis. They're able to do it at a level that was not able to be done before. Because this relational database is able to use thousands of different data points, they are able to calculate this analysis in a way that was never done before. You're not really telling me what more it does. That's what more it does. It's doing it in a way that it's not been done before doesn't tell me what more it does. Your Honor, I return to the district court relied on the Scarborough Declaration, which walked through the differences between the claims and the prior art. And based on those differences between the claims and the prior art, the district court relied on that and Teradata did not rebut it. Where in your yellow brief do you develop this argument, that it's something other than parallel processing? Your Honor, I believe our brief addresses that argument in our response brief. Sorry, wrong brief. Your Honor, our brief addresses that argument at page 56, where it says that the independent calculation of marginal value of each object provides this unconventional arrangement because that was not possible outside the database. Where on 56 is this? This is the heading on 56, and then we discuss it in detail. Again, Your Honors, this is a clear and convincing issue at this point in summary judgment. Your Honors, I see my time is up. I wanted to address a couple of his points, but I defer to the court. We'll give you another minute. Go ahead. Thank you. So I wanted to point out, you know, Teradata complained that Berkeley didn't tell the court when it asked for an extension that it was having trouble getting the discovery it needed. And that's because, once again, it was stuck with this customer severance, and it knew the court would not be responsive. However, I want to make sure that you know that in getting the customer severance, it was Teradata that told the court that it could address everything, and Berkeley tried to work very hard with them to get what they needed. Finally, the customer suit is directed to products, not method claims implemented specifically. Thank you for your time today. This case should be reversed. Okay, thank you. Thank you. Mr. Shaw. Your Honor, just briefly, I think I want to just focus on the 101. This is obviously my rebuttal. A couple things. First, as this court has pointed out in BSG Tech, merely providing a generic environment for a claim method is insufficient. To get back to Judge Bassoon's question, what do you understand them to be arguing at step two other than parallel processing? I don't, Your Honor. As far as I understand it, they're using the parallel processing to suggest that this will expedite the calculation process. In fact, I believe that's consistent with what their expert has said, which is you could do this, it would just be slower. Using the RDBMS makes it faster. The problem with that is if you look at column 11. Did their expert affidavit say that there was another inventive concept at step two? Not that I'm aware of, Your Honor. I believe the focus was on the speed of processing because of parallel processing, which, of course, is not. So for parallel processing, is there any allegation of a specific framework as to how this is achieved or anything? No, Your Honor. Just to make sure I understand your question, certainly the claims nor the specification provide any other understanding other than, as I was about to say, that you perform at the administration based on required calculations using the standard process. And it says, and this is at column 11, lines 25 to 30, see relational database management system textbooks. So nothing unique or new. You're just using a relational database, which these databases have been around since 1980. That's not in dispute. And the point of having them was to have data in a separate location on a server that you could access and process more quickly. Certainly the claims, as we know, do not require that specifically, and that's the problem here. As what we're talking about in these claims are merely using a computer, a relational database, and the way it's meant to be used with certain data to calculate a profit. To that point, if you look at, I think the opposing counsel here mentioned the rules, this is also at column 11 of the patent. If you look at column 11, starting at line 49, going through to the claims, it talks about the rules. But these rules, as it points out, are according to GAAP, i.e., according to general accounting practices. So the patent's not even teaching specific rules or new rules. It's just saying you can use standard accounting rules and you can use them with this standard computer, the RDBMS, which is why, Your Honors, we believe the patents are invalid under 101. If there's no further questions, Your Honor, I see my time is up. Thank you.